UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| BRIAN K. MIGNAULT, SR., | : |
| | : |
| Plaintiff | : |
| | : |
| v. | : No. 3:08cv01063 (DJS) |
| | : |
| LEDYARD PUBLIC SCHOOLS, | : |
| MICHAEL H. GRANER, PETER | : |
| VINCENT, MARCIA P. GRIFFIN | : |
| and ELIZABETH BIGLEY, | : |
| | : |
| Defendants | : |

## MEMORANDUM OF DECISION

The Plaintiff, Brian K. Mignault, Sr., brings this action against the Defendants, Ledyard

Public Schools ("Ledyard "), Michael H. Graner ("Graner"), Peter Vincent ("Vincent"), Marcia

P. Griffin ("Griffin"), and Elizabeth Bigley ("Bigley"). Graner, Vincent, Griffin, and Bigley are

sued in their individual capacities only. The Plaintiff alleges in the Amended Complaint that (1)

the Defendants deprived him of a property right in violation of his procedural due process rights

under the Fourteenth Amendment to the United States Constitution as enforced through 42

U.S.C. §1983, (2) the Defendants violated his substantive due process rights under the

Fourteenth Amendment to the United States Constitution as enforced through 42 U.S.C. §1983,

and (3) the Defendants intentionally inflicted emotional distress upon the Plaintiff in violation of

Connecticut common law.   Ledyard, Graner, Vincent and Griffin (collectively "the School

Defendants") have filed a motion for summary judgment pursuant to Fed. R. Civ. P. 56.   Bigley

has filed a separate motion for summary judgment pursuant to Fed. R. Civ. P. 56.   For the

reasons that follow, the Defendants' motions for summary judgment **(dkt. #97 and #101)** are **GRANTED**.

## I. FACTS

The Plaintiff was a paid assistant football coach at Ledyard High School in 1979 and in each year from 1993 to 2005. Graner has been the Ledyard Superintendent of Schools since 2003. Vincent has been the Athletic Director of Ledyard High School since 2001. Griffin was the Principal of Ledyard High School from 1998 to 2007. Bigley was an assistant to the secretary at Ledyard High School from 2001 to 2007 and is the mother of Ernie Richard[1] ("Richard"), who was a student at Ledyard High School and a member of the football team in 2005. The Plaintiff's father, William F. Mignault, Sr., served as Ledyard High School's head football coach for 42 years before retiring in 2007.

Ledyard has a district-wide nepotism policy ("the Nepotism Policy"), adopted on December 21, 1994, that states in relevant part: "Members of the same family may be employed in the same department or work location when approved in writing by the Superintendent. However, a family member shall not be approved for a position that places him or her in a direct line of supervision with regard to the other family member." (Dkt. # 98-17, at 2.) When the Plaintiff was hired for the 1979, 1993 and 1994 football seasons, the Nepotism Policy was not in place. The policy was in place, however, when the Plaintiff was hired for each season from 1995 to 2005 to work in a position where he was in a direct line of supervision with his father.

---

[1] The School Defendants' Rule 56 (a)(1) Statement refers to Bigley's son as "Ernie Richards" while Bigley's Rule 56 (a)(1) Statement refers to her son as "Ernie Richard." The Court will refer to Bigley's son as "Ernie Richard" in this decision.

A.  Spectator Behavior Directed at the Plaintiff

At the beginning of the fall 2005 football season, the Plaintiff's son, Marc Mignault, was competing with Richard for the starting quarterback position on the Ledyard High School football team.  Richard was injured before the first game of the season.  When Richard was cleared medically to play and was able to throw the football, Marc Mignault remained the starting quarterback.

Marc Mignault played quarterback for Ledyard at a game held at Ledyard High School on October 7, 2005.  A number of spectators and the school cheerleaders chanted Richard's name ("Ernie, Ernie, Ernie") every time that Marc Mignault took the field .  Bigley participated in the "Ernie, Ernie, Ernie" chant on several occasions during the game.  Additionally, spectators yelled obscenities directed at the Plaintiff and yelled critical remarks directed at both the Plaintiff and Marc Mignault.  The Plaintiff contends that Bigley was one of the spectators yelling these remarks at him and his son.  In her Rule 56 (a)(1) Statement, Bigley neither admitted nor denied engaging in such behavior, but instead indicated that "[i]t is the plaintiff's claim that Bigley said" such things at the October 7, 2005 game.

Shortly after the October 7, 2005 game, the Plaintiff's wife, Nancy Mignault, sent a complaint to Graner via email regarding conduct at the game.   Griffin and Vincent subsequently arranged for a school administrator to attend home football games and for a public address announcement to be made at a home football game concerning fan behavior.  For the remainder of the 2005 season, the Plaintiff did not personally witness any taunting during home football

games, although the Plaintiff testified at his deposition that it was reported to him by third

parties that spectators continued such behavior during games.

B.  Complaints Lodged Against the Plaintiff

At all times relevant to this case, Ledyard had in place a district-wide bullying policy (the

"Bullying Policy").  The Bullying Policy states that students and parents of students may  report

instances of bullying and "[t]he school will investigate reports of bullying and will take any

action deemed appropriate, based on the particular circumstances, to rectify the situation and

protect the individuals involved."  (Dkt. # 98-7, at 4.)  Bullying is defined by the policy as "any

overt act or acts by a student, a group of students, or staff member(s) directed against another

student with the intent to ridicule, humiliate or intimidate the other student while on school

grounds or at a school-sponsored activity which acts are repeated against the same student over

time."  (Id.)

Between October 10, 2005, and October 31, 2005, Griffin received a number of written

complaints about the Plaintiff[2] from parents of current and former football players at Ledyard

High School (including Bigley) and from current and former football players.  The complaints

were generally regarding (1) the Plaintiff's alleged intimidating and bullying behavior toward

players on the Ledyard High School football team, (2) the Plaintiff's alleged favoritism for

certain players, particularly his son Marc Mignault, (3) the Plaintiff's alleged consistent tardiness

to practice, and (4) an alleged violation of the Nepotism Policy due to the fact that the Plaintiff

---

[2]Some of the complaints were about the Plaintiff's father, who is not a party to this action.

was directly supervised by his father.  Bigley's complaint was made on a form designed for complaints made pursuant to the Bullying Policy.  (Dkt. # 103-1, at 70.)

C.  Investigating the Complaints Against the Plaintiff

Griffin investigated the complaints against the Plaintiff by interviewing the Plaintiff, all complainants, six additional current and past members of the football team, two additional parents, two former coaches, and William Mignault.  Vincent and Assistant Principal Shane Winters ("Winters") were also present during Griffin's interview with the Plaintiff.  During the course of his interview, the Plaintiff asked why the Ledyard Athletic Policy was not being followed with regard to the complaints that were being investigated.   Griffin told the Plaintiff that "[w]ritten complaints have come through our process for harassing and bullying and intimidating."  (Dkt. # 98-9, at 11.)  Vincent then added the following:  "That supersedes the parent going to you saying I feel that you are bullying, intimidating, or harassing my son..  So, there is a [sic] official complaint form . . . ." (Id.)  Griffin proceeded to ask the Plaintiff questions relating to the substance of the complaints.  The Plaintiff denied having ever engaged in bullying, intimidating, or harassing behavior or showing favoritism toward any player(s) on the football team.

The Plaintiff requested, but was denied, copies of the complaints and the identities of the complaining parties.  During his interview, the Plaintiff expressed his concern that some of the complainants may be the same people who had made inappropriate remarks at the October 7, 2005 football game and that "[t]his has been a well coordinated event by a few parents.  I am not exactly sure how many . . . to try to create trouble for myself." (Id. at 10.)   Griffin responded to

the Plaintiff's concerns arising out of the October 7, 2005 game by stating that "we have addressed in any way that we can issues that we believe need to be addressed as far as the concerns from that particular game. So, I am hoping that . . . that is taken care of." (Id. at 12.) She then told the Plaintiff that "I will call you as soon as we get where we need to be and let you know. We'll either meet again because I have more questions or we'll meet and I will tell you what the results of our investigation is [sic]." (Id.)

D. Results of the Investigation

An eight page written report of the investigation into the complaints against the Plaintiff ("the Report") was issued on November 10, 2005, under the signatures of Griffin, Vincent, and Winters. The Report found that the evidence supported four of the complaints made against the Plaintiff[3]: (1) that the Plaintiff had on one occasion inappropriately grabbed a football player by his face mask; (2) that on one occasion the Plaintiff had used inappropriate language in speaking to a player; (3) that the Plaintiff was consistently tardy to football practice; and (4) violation of the Nepotism Policy. (Dkt. # 98-12, at 3, 4, 6, 7.) The Report also found that eight complaints made against the Plaintiff were unsubstantiated: (1) that the Plaintiff intimidated a specific player during and after a football game in 2004; (2) that the Plaintiff retaliated against a player in response to a phone call made by the parent of that player; (3) that the Plaintiff commonly used inappropriate language to discipline players; (4) that the Plaintiff compared other players' performances unfavorably with his relatives' performances and didn't allow any criticism of his relatives' performances by other players; (5) that rules were not consistently applied to the

---

[3]The Report also substantiated two other violations by individuals other than the Plaintiff who are not parties to this action.

Plaintiff's relatives; (6) that the Plaintiff consistently bullied a specific player; (7) that the Plaintiff put his personal family interest above the interest of the football team; and (8) that the Plaintiff "mentally breaks kids down."  (Id. at 3-7.)

The Report concluded with a summary and five directives.  The summary stated in part that "Coach Brian Mignault is not well liked by many of the varsity LHS players.  However, they did not see, hear or otherwise witness acts of intimidation or bullying of players except one act of intimidation occurring when a player's mask was inappropriately grabbed by Coach Brian Mignault."  (Id. at 8.)  The summary also stated that "[t]he fact that the head coach and his assistant are related violates Board of Education policy regarding nepotism.  The fact that father and son are making decisions about players' positions and playing time when one of the players is a relative, could lead to the appearance of favoritism.  From the information gathered during this investigation Brian Mignault has not alleviated this perception of favoritism and may have exacerbated it."  (Id.)  The final section of the Report listed five directives: (1) the Plaintiff was not to touch any player in a threatening or unsafe manner; (2) the Plaintiff was to meet with the head coach and Vincent to create a plan to address the negative perception of the Plaintiff's coaching style; (3) former players would not be allowed on the sidelines during games or be allowed to "take the role of a coach in addressing the team"; (4) the Plaintiff was to arrive at practice by 3:30 p.m. on a regular basis; and (5) the Plaintiff's evaluations were to be done by the athletic director, and not by the Plaintiff's father, "[w]hile the violation of Board of Education Policy 4112.8 [the Nepotism Policy] exists . . . ." (Id. at 9.)  Following the directives was the following admonition: "Failure to follow these directives will result in disciplinary action up to and including termination."  (Id.)

E.  Release of Investigation Report

On November 10, 2005, Griffin met with the Plaintiff to review the Report.  At that meeting the Plaintiff requested that Griffin not release the Report until his attorney had a chance to speak with her or the Board of Education's attorney.  Griffin agreed not to release the Report until after the Plaintiff's attorney had a chance to speak with her or the Board's attorney.  On November 15, 2005,  the Plaintiff and his attorney met with Assistant Superintendent Cathy Patterson ("Patterson") and the attorney for Ledyard to review the Report's contents.   Graner joined the meeting in progress.  At that meeting, Patterson informed the Plaintiff that the investigation was closed and that if the Plaintiff wanted it reopened, he could make that request of Griffin or Vincent.  The Plaintiff was informed that the investigation's findings had not resulted in a determination that the Plaintiff was unfit to continue coaching.  The Plaintiff voiced his disagreement with the school's position that the entire Report should be released publicly. After meeting privately with his attorney for approximately one hour, however, the Plaintiff consented to the public release of the entire Report.

At the November 15, 2005 meeting, the Plaintiff was advised that Graner would be discussing the Report with the Board of Education at the Board's meeting on November 16, 2005, and that the Plaintiff, if he wished to do so, could provide Graner with additional information to share with the Board at that meeting.   The Plaintiff subsequently  wrote a letter to Graner, dated November 16, 2005, in which he expressed his "disappoint[ment] with the overall design of the investigation and my inability to respond to any specific concerns."  (Dkt. # 98-13, at 3.)   The Plaintiff requested that additional interviews be conducted with specific individuals

named or described in his letter.   The Plaintiff also indicated his belief that the complaints

against him were the final step in a three-part plan by certain parents to "impose their will on the

Ledyard Football coaching staff" through (1) a letter and email campaign to the local

newspapers, (2) public humiliation at the October 7, 2005 football game, and (3) a personal

attack on the Plaintiff by lodging complaints against him.  (Id. at 4.)

Despite the objections raised in the Plaintiff's letter, Graner decided that no additional

interviews would be conducted relative to the complaints against the Plaintiff.   Graner met with

the Ledyard Board of Education on November 16, 2005, and recommended that the Plaintiff be

permitted to continue as a paid coach for the remainder of the 2005 football season and thereafter

serve in the capacity of a volunteer coach while his father was still the head coach.   On

November 22, 2005, Graner advised the Plaintiff in an email that the Plaintiff would not be

appointed as a paid coach in 2006, but would be permitted to "volunteer as a coach to help your

father, but . . .  not fill a position typically done by one of the paid assistant coaches."  (Dkt. # 98-

16, at 2.)    Graner cited the Nepotism Policy as the reason for changing the Plaintiff's coaching

status.  In a reply to Graner's email, the Plaintiff stated that "I do not agree with this at all.  I have

been a paid coach for 13 years.  Also, why should my duties be limited because I am a

volunteer?"  (Dkt. # 103-2, at 50.)

F.  Dissemination of Investigation  Report

On November 16, 2005, the Report was made available to complainants upon request.

Bigley received a copy of the Report that day.   The Report did not identify students by name, but

simply referred to "Student A, Student B," etc.   On her copy of the Report, Bigley made a

notation that "Student G is a former student, and a relative of both Bill Mignault and Brian Mignault." (Dkt. # 98-14, at 4.)  Bigley, in her capacity as assistant to the secretary at Ledyard High School, received a request from Virginia Martic ("Martic"), one of the parents who had filed a complaint against the Plaintiff, to obtain a copy of the Report via fax.  After verifying with Assistant Principal Winters that the Report was a public document, Bigley faxed her annotated copy of the Report to Martic from the Ledyard High School fax machine.

On November 18, 2005, Bigley and Martic placed copies of the Report on cars at Ledyard High School.  That same day, Bigley and Cindy Burke ("Burke"), another parent who had made complaints against the Plaintiff, placed copies of the Report on cars at Harvard H. Ellis Technical High School, where the Plaintiff was employed as the school Principal.   The version of the Report distributed by Bigley, Martic, and Burke redacted six of the thirteen complaints listed in the original Report and contained Bigley's handwritten notation concerning "Student G."   (Dkt. # 98-14.)  Of the six complaints redacted from the original version of the Report, five complaints were reported as unverified and one complaint did not directly pertain to the Plaintiff. (Id.)   The redacted Report bore fax markings indicating it was faxed from Ledyard High School on November 17, 2005.  (Id.)

The Plaintiff complained to the Connecticut State Police and also to Graner and Griffin regarding the placement of the redacted Report on cars at the schools.  The attorney for the Ledyard School Board advised Graner and Griffin  that there was not much they could do about the redacted Report since the Report was a public document and had only been redacted and not rewritten by those distributing it.   Graner contacted the Ledyard Police about the placement of

the redacted Report on cars at Ledyard High School and was informed that the Town of Ledyard did not have an ordinance prohibiting the distribution of flyers on cars. The Connecticut State Police never contacted Graner concerning the distribution of the redacted Report. Graner instructed Griffin to investigate the issue of the faxed redacted Report in an effort to determine who had sent the fax and to whom the document was faxed. Griffin subsequently reported back to Graner that it was too late to determine to whom the document was faxed, since the machine only stored information concerning the last thirty fax transmissions. She further reported that the fax machine was available to a large number of people and that she could not determine who had sent the fax on November 17, 2005. Bigley acknowledged having faxed her copy of the Report with the handwritten notation concerning "Student G" to Martic, but denied faxing the redacted copy of the Report from the Ledyard High School fax machine.

On December 2, 2005, William Mignault filed a complaint form with Griffin indicating that Bigley "has continuously harassed Mr. Brian Mignault and Mr. William F. Mignault Sr. since October 7, 2005." (Dkt. # 98-18, at 2.) The complaint referred to the dissemination of the Report at Ellis Technical High School and Ledyard High School and also stated that Bigley "talked to and tried to influence senior [football] players with untruths against the Ledyard Football Coaching Staff." (Id.) That same day, the Plaintiff informed Griffin and Graner that copies of the Report were placed in employees' mailboxes at Ledyard High School and mentioned that his attorney "believes this is becoming an issue of harassment." (Dkt. # 98-19, at 3-4.) On December 12, 2005, Griffin responded to the concerns raised by the Plaintiff and William Mignault with six statements of "findings," indicating that (1) Griffin was supporting the ongoing police investigation into determining who distributed the redacted Report at Ellis

Technical High School, (2) there was no evidence that Bigley participated in distributing the Report at Ledyard High School[4], (3) there was no evidence that Bigley placed copies of the Report in staff mailboxes, (4) Bigley had spoken with some football players to "provide[] updates . . . concerning the complaint procedure," but there was insufficient evidence to validate that she had tried to influence players with "untruths against the LH Football coaching staff," (5) there was no new information as to who faxed the redacted copy of the Report, and (6) five individuals, including Bigley, had received copies of the original Report. (Dkt. # 98-20.)

G. Action Taken Following Investigation

On January 30, 2006, Graner and Griffin met with parents who had filed bullying complaints against the Plaintiff in October 2005. The parents expressed their desire that the Plaintiff not be permitted to return as a coach in any capacity, including as a volunteer. Graner advised the parents that the Plaintiff would be returning for the 2006 football season as a volunteer coach. Graner further informed the parents that he would be preparing a final response concerning the investigation of the bullying complaints against the Plaintiff and the meeting of January 30, 2006.

On March 9, 2006, Graner met with the Plaintiff and William Mignault and discussed the Plaintiff's continued involvement with the football team. At that meeting the Plaintiff stated his desire to continue in a paid coaching position and submitted a list of desired responsibilities with the team moving forward. The Plaintiff also presented Graner with various concerns he had

_____

[4]In her responses to the Plaintiff's interrogatories, Bigley admitted placing copies of the Report on cars at Ledyard High School and at Ellis Technical High School. (Dkt. # 107-8, at 8.)

relating to Ledyard High School administration and athletics, as well as his "desired outcomes." (Dkt. # 98-22, at 3-4.)

Graner subsequently prepared a draft of a letter to the complaining parents which he forwarded to the Plaintiff for his review and comment. The draft included "specific guidelines which will define [the Plaintiff's] role as a volunteer coach." (Dkt. # 98-23, at 2.) In his response to the draft letter, the Plaintiff expressed his view that the draft letter wrongly insinuated that the Plaintiff had not treated players with fairness and respect. The Plaintiff also expressed his concern that the guidelines defining his role as a volunteer coach did not reflect "what we had intended and what you had stated I would be allowed to do." (Id.)

Graner sent a letter, dated March 20, 2006, to the parents who had attended the January 30, 2006 meeting. The Plaintiff, Griffin, Vincent, and William Mignault also received a copy of the letter. Graner's letter informed the parents that, despite their objections, "Brian Mignault should continue as an assistant football coach, but only in a volunteer capacity. His employment in that position as a paid coach violates Board Policy 4112.8 [the Nepotism Policy]. As a result, he will not be employed in that role in the fall of 2006." (Dkt. # 98-24, at 2.) Certain guidelines concerning the Plaintiff's duties as a volunteer coach were specified in the letter.

Some parents who received Graner's letter requested a hearing with the Board of Education to explain their concerns regarding the Plaintiff. On April 6, 2006, in a letter to the parents who had requested a hearing, Sharon Hightower, the Chair of the Ledyard Board of Education, indicated that the Board had denied the parents' request for a hearing and endorsed Graner's guidelines for the Plaintiff's return as a volunteer coach.

The Plaintiff alleges that after he received a copy of Graner's March 20, 2006 letter, he "was waiting to receive a letter from Dr. Graner or an invitation to meet with Dr. Graner to discuss the employment issue." (Dkt. # 107-4, at 18.)  When neither of these things happened, he "sent a letter to Dr. Graner dated August 26, 2006 seeking clarification of my employment status." (Id. at 19.)  Graner responded in a letter dated September 8, 2006, expressing his "disappoint[ment] to read that your status as a volunteer coach is unclear to you," and suggesting that the Plaintiff review the March 20, 2006 letter and contact Vincent if the Plaintiff had further questions regarding his status. (Dkt. # 107-7, at 23.)  The Plaintiff sent a letter to Vincent dated October 1, 2006, asking, among other things, why he did not receive direct notification of a change in his employment status.  Vincent responded in a letter dated October 5, 2006, stating that "[t]he letter dated March 20, 2006 was the final determination from the Ledyard Administration and the Ledyard Board of Education.  The March 20th letter laid out all the guidelines that you were to follow for the season." (Dkt. # 107-8, at 23.)   According to the Plaintiff, he sent another letter to Vincent, dated October 8, 2006, requesting additional information, but Vincent did not respond to that letter.

## II. STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the governing law. . . ." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute over a material

fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . or (B) showing that the materials cited to do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56 (c)(1). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which a jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. When the court rules on a summary judgment motion, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. at 255. Summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

### III. DISCUSSION

#### A. Procedural Due Process

"The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property. When protected interests are implicated, the right to some kind of prior hearing is paramount. But the range of interests protected by procedural due process is not infinite." Board of Regents v. Roth, 408 U.S. 564, 569-70 (1972). In resolving a procedural due process claim, "[f]irst, we must determine whether some source of law other than the Constitution, such as a state or federal

-15-

statute, confers a property right on the plaintiff."  O'Connor v. Pierson, 426 F.3d 187, 196 (2d

Cir. 2005).  "Once such a property right is found, we must determine whether that property right

'constitutes a property interest for purposes of the Fourteenth Amendment.'"  Id. (quoting Town

of Castle Rock v. Gonzales, 545 U.S. 748, 756 (2005)).

Although "the property interests protected by procedural due process extend will beyond

actual ownership of real estate, chattels, or money," Roth, 408 U.S. at 571-72, "[i]n the

employment context, a property interest arises only where the state is barred, whether by statute

or contract, from terminating (or not renewing) the employment relationship *without cause*."

Taravella v. Town of Wolcott, 599 F.3d 129, 134 (2d Cir. 2010) (internal quotation marks

omitted).  In this case, the Plaintiff would have a property interest protected by the Fourteenth

Amendment if a contract or Connecticut law provided that cause must be shown prior to the

termination or non-renewal of his paid coaching position.  Under Connecticut law, an employee

is deemed to be an employee at will absent a contract or statute that provides otherwise.  See

Torosyan v. Boehringer Ingelheim Pharmaceuticals, Inc.,  234 Conn. 1, 14-15 (1995).

In his Amended Complaint, the Plaintiff asserts that "[h]e had a vested property interest

in that position [paid Assistant Football Coach] by virtue of the provisions of Section 10-222e of

the Connecticut General Statutes."  (Dkt. # 33, ¶ 3.)  Hence, the Court must analyze that statute

to determine whether it prohibits termination or non-renewal of a coaching position without

cause.  Conn. Gen. Stat. § 10-222e (b) provides that:

> [a]ny local or regional board of education acting directly, or through
> its duly authorized agent, that terminates or declines to renew
> the coaching contract of an athletic coach who has served in the

same coaching position for three or more consecutive school years shall inform such coach of such decision no later than ninety days after the completion of the sport season covered by the contract. Such coach shall have an opportunity to appeal such decision to the local or regional board of education in a manner prescribed by such local or regional board of education. Nothing in this subsection shall prohibit a local or regional board of education from terminating the coaching contract of an athletic coach at any time (1) for reasons of moral misconduct, insubordination or a violation of the rules of the board of education, or (2) because a sport has been cancelled by the board of education.

Two recent cases in this district have expressly ruled that Conn. Gen. Stat. § 10-222e does not mandate that an athletic coach can only be dismissed for cause, and thus the statute does not confer a property interest protected by the Fourteenth Amendment. See Esposito-Cogan v. East Haven Bd. of Education, No. 3:07-CV-681 (CFD), 2009 WL 839015, at *5 (D. Conn. March 30, 2009) ("The statute's procedural (ninety-day notice) requirement does not give an athletic coach a substantive entitlement to the renewal of her contract if the procedural requirement if not followed."); Patria v. East Hartford Bd. of Education, No. 3:07CV00428 (DJS), 2009 WL 840667, at *7 (D. Conn. March 31, 2009)("The statute does not require that the termination or non-renewal of a coaching contract, even for a three-year coach, must be for cause.").

The Court believes the reasoning in Esposito-Cogan and Patria to be sound and concludes that the holdings of those cases squarely apply to the procedural due process claim in this case. Conn. Gen.Stat. §10-222e does not require that the termination of an athletic coach in Connecticut must be for cause, and thus, that statute does not give rise to a property interest

protected by the Due Process Clause of the Fourteenth Amendment.  See Taravella, 599 F.3d at

134.   The statute imposes a ninety-day notice requirement and provides that a coach shall have

an opportunity to appeal the decision in a manner outlined by the board of education, but

contains no provision stating that a coach's dismissal or non-renewal must be for cause.  "The

statute confers state-created procedural rights that give athletic coaches an expectation that the

procedures will be followed, but does not guarantee a right to continued employment if they are

not."  Esposito-Cogan, 2009 WL 839015, at *4.  Since no constitutionally protected property

interest has been identified, the Defendants are entitled to summary judgment as to the Plaintiff's

claim that "the defendants deprived the plaintiff of a property right without procedural due

process of law in violation of the Fourteenth Amendment to the United States Constitution as

enforced through Sections 1983 and 1988 of Title 42 of the United States Code."  (Dkt. # 33, ¶

16.)

        The constitutionally protected property interest alleged by the Plaintiff in his Amended

Complaint is specifically identified as "a vested property interest in that position [paid Assistant

Football Coach] by virtue of the provisions of Section 10-222e of the Connecticut General

Statutes."  (Dkt. # 33,  ¶ 3.)   The Court notes that in his Brief in Opposition to Defendants'

Motions for Summary Judgment, the Plaintiff asserts that he "had a property interest in the

defendant Board's adherence to its own procedures."  (Dkt. # 107, at 11.)   "It is well established

that a party cannot assert a claim for the first time in its motion papers."  Global Crossing

Bandwidth, Inc., v. Locus Telecommunication, Inc., 632 F.Supp. 2d 224, 245 (W.D.N.Y. 2009).

See Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may

not amend her complaint through argument in a brief opposing summary judgment.");  Allah v.

Poole, 506 F. Supp.2d 174, 193 (W.D.N.Y. 2007) ("a memorandum of law or other motion papers are not proper vehicles by which to raise claims that are not asserted in the complaint"). Because the Plaintiff did not assert "a property interest in the defendant Board's adherence to its own procedures" in his Amended Complaint, any such claim has been waived.  See Global Crossing Bandwidth, Inc., 632 F.Supp.2d at 245.

Even if the Plaintiff had properly asserted in his Amended Complaint that he had a constitutionally protected property interest in the Board's adherence to its own procedures, the addition of such a claim would not enable  his procedural due process claim to survive summary judgment.  "Process is not an end in itself.  Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement." Olim v. Wakinekona, 461 U.S. 238, 250 (1983).  In presenting his argument concerning the Board's adherence to its own procedures, the Plaintiff appears to acknowledge the necessity of a constitutionally protected substantive interest, stating that "[o]nce the Court determines that the plaintiff, in fact, did have a valid interest and expectation in continued work with the Ledyard High School football team, absent a serious offense or gross negligence, the issues focus on the intent of the defendants as suggested by their acts and omissions [in conducting their investigation of complaints against the Plaintiff]." (Dkt. # 107, at 8.)   The Court has already concluded that no constitutionally protected interest in the Plaintiff's position as a paid assistant football coach has been identified. Consequently, the premise upon which the Plaintiff's argument depends has not been established.

Although it is not entirely clear which Board procedures the Plaintiff intended to include in his claim of a constitutionally protected interest, the argument in his brief focuses on the Bullying Policy.  (Dkt. # 107, at 8-11.)   In presenting this alternative due process argument, the

Plaintiff relies on the discussion of procedural due process in Maglietti v. Nicholson, 517 F.Supp.2d 624 (D. Conn. 2007).  Maglietti, in turn, cites to the decision of the Second Circuit in Ezekwo v. NYC Health & Hospitals Corp., 940 F.2d 775 (2d Cir. 1991).  In Ezekwo, the plaintiff, who was a medical resident, claimed that she had a constitutionally protected property interest in the position of Chief Resident at the hospital where she was employed.  The Second Circuit determined that the plaintiff's expectation of performing the duties of Chief Resident was "a contractual right [concerning the terms of her employment] that rose to the level of a significant property interest that would be protected under state law."  940 F.2d at 783.  In Maglietti, the plaintiff, who had filed a grievance relating to an involuntary transfer,  claimed that she had relied on internal policies which her employer had not followed.  The District Court addressed the plaintiff's procedural due process claim in terms of a "contractual benefit [that] rises to the level of a constitutionally protected property interest."  517 F.Supp.2d at 636.  The Court concludes that the findings of employment-related contractual rights that rose to the level of  constitutionally protected property interests in Ezekwo and Maglietti would have provided no support for the Plaintiff's claim that he had a property interest in the Board's adherence to its own procedures in the Bullying Policy.

**B.  Substantive Due Process**

Substantive due process protects only  those fundamental rights that are "deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed."  Washington v. Glucksberg, 521 U.S. 702, 721 (1997) (internal quotation marks and citations omitted).   "Substantive due process is an

outer limit on the legitimacy of government action." Natale v. Town of Ridgefield, 170 F.3d 258, 263 (2d Cir. 1999). "Our Constitution deals with the large concerns of the governors and the governed, but it does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society." Daniels v. Williams, 474 U.S. 327, 332 (1986). "In order to sustain a substantive due process claim, a plaintiff must demonstrate, *inter alia*, that he was deprived of a fundamental constitutional right by government action that is arbitrary or conscience-shocking." Walker v. City of Waterbury, 361 F.App'x 163, 165 (2d Cir. 2010) (internal quotation marks and citation omitted).

Aside from asserting a property interest in his continued employment as a paid assistant football coach, the Plaintiff's Amended Complaint does not identify a fundamental right that was denied by the Defendants. As previously discussed, the property interest that the Plaintiff asserts is not a property interest protected by the Fourteenth Amendment.[5] Further, with regard to a substantive due process claim, "[g]enerally, interests related to employment are not protected. See Harrah Indep. Sch. Dist. v. Martin, 440 U.S. 194, 198, 99 S. Ct. 1062, 59 L. Ed. 2d 248 (1978) (contrasting interest related to employment with traditional interests protected by substantive due process, such as procreation, marriage, and family life)." Id. "It is well settled that, where the alleged right . . . cannot be considered so rooted in the traditions and conscience of our people as to be ranked as fundamental, notions of substantive due process will not apply." Local 342, Long Island Public Service Employees v. Town Board, 31 F.3d 1191, 1196 (2d Cir. 1994) (internal quotation marks omitted); see also Walker, 361 F.App'x at 165 ("substantive due

---

[5] As was also previously discussed, the claimed "property interest in the defendant Board's adherence to its own procedures," (dkt. # 107, at 11), which was asserted for the first time in the Plaintiff's brief in opposition to the motion for summary judgment, similarly does not identify a constitutionally protected property interest.

process protections extend only to those interests that are implicit in the concept of ordered liberty" (internal quotation marks omitted)).   Since the Plaintiff's Amended Complaint does not identify a fundamental right that was allegedly denied by the Defendants, the Plaintiff's substantive due process claim cannot be sustained and the Defendants' motions for summary judgment must be granted as to that claim.

## C.  Conspiracy

In his Amended Complaint, the Plaintiff avers that "[a]ll of the defendants conspired together to remove the plaintiff from his . . . tenured position."  (Dkt. # 33, ¶ 11.)   In their motions for summary judgment, the Defendants argue that to the extent the Plaintiff is alleging a conspiracy claim, that claim fails as a matter of law.   The Plaintiff failed to respond to this argument in his brief in opposition to the Defendants' motions for summary judgment.   "Plaintiffs have not responded to defendants' argument that [plaintiffs' conspiracy] claim cannot stand.  Therefore, these claims will be dismissed as abandoned."  Jackson Hill Rd. Sharon CT, LLC v. Town of Sharon, No. 3:07-cv-1445 (WWE), 2010 U.S. Dist. LEXIS 62908, at *15 (D.Conn.  June 24, 2010); see also Barlow v. Connecticut, 319 F.Supp.2d 250, 266-67 (D. Conn. 2004)(Since the plaintiff did not respond to the defendant's argument that the plaintiff failed to establish a particular claim, "the court could consider this claim abandoned.").   In any event, "having found that none of the individual Defendants in this case violated Plaintiff's constitutional rights, we need not decide whether they can properly be charged with conspiring to violate these rights under § 1983."  Anemone v. Metro. Transp. Auth., 629 F.3d 97, 121 (2d Cir.

2011).  For these reasons, the Court grants the Defendants' motions for summary judgment as to the Plaintiff's conspiracy claim.

## D.  Qualified Immunity

In their summary judgment motions, the individual Defendants assert that they are entitled to qualified immunity as to the Plaintiff's constitutional claims.  Because the Court has concluded that the Defendants are entitled to summary judgment as to all of the Plaintiff's constitutional claims, it is not necessary to address the qualified immunity question.

## E. Municipal Liability

Ledyard Public Schools is one of the named defendants in the Amended Complaint.  The Plaintiff  "claims that his injuries . . . were caused by the de facto policy of Ledyard Public Schools in approving and condoning the actions of Michael Graner, Marcia Griffin and Peter Vincent during the 2005-2006 school year, which deprived him of his reputation in the community and his paid coaching position."  (Dkt. # 107, at 15.)  "Because the Court has found that the individual defendants have not violated the Plaintiff's constitutional rights, *a fortiori*, the [municipal defendant] cannot be found liable for violations of the Plaintiff's constitutional rights."  Patria, 2009 WL 840667, at *12.

## F.  Intentional Infliction of Emotional Distress

In their summary judgment motions, the individual Defendants argue that the Plaintiff's allegations that he was terminated as a paid assistant football coach, subjected to obscene shouts and taunting at football games, and the subject of a performance evaluation that was publicly

disseminated fall short of the stringent standards applicable to claims of intentional infliction of emotional distress. In opposing the motions for summary judgment, the Plaintiff describes his intentional infliction of emotional distress claim as follows:

> In this case, an internal memorandum concerning the plaintiff's actions toward members of the football team, prepared in a hurried manner, was released to the public (plaintiff consented under duress) by defendant Granter [sic] and Griffin. Defendant Griffin immediately provided it to defendant Bigley, who distributed it throughout the community. The plaintiff, a Principal at a neighboring Technical High School, was humiliated and scorned by his professional and home community. He was then terminated from his paid Assistant Coach position, in order to mollify several parents who made repeated complaints to defendant Graner about the plaintiff during the 2005-2006 school year. The plaintiff has been consumed by this personal loss and humiliation.

(Dkt. # 107, at 19.) As further explained below, the Court agrees with the Defendants that the undisputed facts in this case do not rise to the level of "extreme and outrageous conduct" and, for that reason, fail to state a claim of intentional infliction of emotional distress.

In Connecticut, a plaintiff cannot prevail on a claim for intentional infliction of emotional distress without showing "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." Appleton v. Board of Education, 254 Conn. 205, 210 (2000) (internal quotation marks omitted). Liability for intentional infliction of emotional distress "has been found only where the conduct

has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Id. at 210-11. "Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine." Id. at 210.

In connection with his intentional infliction of emotional distress claim, the Plaintiff asserts that "an internal memorandum concerning the plaintiff's actions toward members of the football team, prepared in a hurried manner, was released to the public (plaintiff consented under duress) by defendant Granter [sic] and Griffin." (Dkt. # 107, at 19.) It is undisputed that the "internal memorandum" referenced by the Plaintiff was the Investigation Report Concerning Football Complaints that resulted from the investigation of complaints about the Plaintiff received by Griffin from parents of current and former football players and from current and former football players. It is also undisputed that the Plaintiff agreed, albeit reluctantly, to the public release of the Report after consulting with his attorney. The Court has no hesitation in concluding that these allegations do not satisfy the "extreme and outrageous conduct" requirement necessary to state a claim for intentional infliction of emotional distress.

The Plaintiff further contends that "Defendant Griffin immediately provided [the Report] to defendant Bigley, who distributed it throughout the community. The plaintiff, a Principal at a neighboring Technical High School, was humiliated and scorned by his professional and home community." (Dkt. # 107, at 19.) "These occurrences may very well have been distressing and hurtful to the plaintiff. They do not, however, constitute extreme and outrageous conduct within

the meaning of the [intentional infliction of emotional distress] precedents to which we referred previously." Appleton, 254 Conn. at 211. The Court notes once again that the Plaintiff had agreed to the public release of the Report. Additionally, when the Defendant Graner contacted the Ledyard Police Department about the placement of copies of the Report on cars at Ledyard High School, he was advised that the Town of Ledyard had no ordinance against such conduct and that such conduct was not illegal.

The Plaintiff also asserts that he was "terminated from his paid Assistant Coach position, in order to mollify several parents who made repeated complaints to defendant Graner about the plaintiff during the 2005-2006 school year." (Dkt. # 107, at 19.) "In the employment context, it is the employer's conduct, not the motive behind the conduct, that must be extreme or outrageous. An employer's adverse yet routine employment action, even if improperly motivated, does not constitute extreme and outrageous behavior when the employer does not conduct that action in an egregious and oppressive manner." Miner v. Town of Cheshire, 126 F. Supp. 2d 184, 195 (D. Conn. 2000)(citation omitted). There is nothing about the change in the Plaintiff's status from paid assistant coach to unpaid volunteer that suggests such action was conducted in an egregious and oppressive manner. Consequently, that conduct cannot support a claim of intentional infliction of emotional distress.

The Court has determined that the conduct relied upon by the Plaintiff does not satisfy the "extreme and outrageous" requirement necessary to state an intentional infliction of emotional

distress claim under Connecticut law.  Consequently, the Court grants the Defendants' motions

for summary judgment as to the Plaintiff's intentional infliction of emotional distress claim.[6]


## IV.  CONCLUSION

For the foregoing reasons, the Defendants' motions for summary judgment **(dkt. # 97 and #101)** are **GRANTED**.  The Clerk is directed to close the case.

**SO ORDERED** this 16th  day of May,  2011.



/s/ DJS

**DOMINIC J. SQUATRITO**

**UNITED STATES DISTRICT JUDGE**

---

[6]In his Amended Complaint, the Plaintiff  also alleged that the Defendant Bigley had instigated obscene shouts and taunting directed at the Plaintiff at football games.  Although the Defendants addressed this claim in their motions for summary judgment, the Plaintiff did not respond to their arguments in this regard.  For that reason, this claim may be considered abandoned.  See Barlow, 319 F. Supp. 2d at 266-67 (D. Conn. 2004).  In any case, such a claim would have been unavailing to the Plaintiff, since "Connecticut courts hold that insults, verbal taunts, threats, indignities, annoyances, petty oppressions or conduct that displays bad manners or results in hurt feelings do not support a claim for intentional infliction of emotional distress."  Miner, 126 F. Supp. 2d at 195.